UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | )   CR 18-260-JAS(DTF) |
| | ) |
| vs. | ) |
| | )   Tucson, Arizona |
| Alfonso Jose Mendez, Jr., | )   June 21, 2019 |
| | )   2:30 p.m. |
| Defendant. | ) |

TRANSCRIPT OF PROCEEDINGS
SENTENCING HEARING


BEFORE THE HONORABLE JAMES A. SOTO
UNITED STATES DISTRICT JUDGE
405 W. CONGRESS STREET
TUCSON, ARIZONA 85701


Cindy J. Shearman, RDR, CRR, CRC
405 W. Congress Street, Suite 1500
Tucson, AZ 85701
520-205-4286


Proceedings Reported by Realtime Court Reporter
Transcript prepared by computer-aided transcription

1                            A P P E A R A N C E S

2

For the Plaintiff:
3

Gordon Davenport, III
4    Assistant U.S. Attorney
405 W. Congress Street, Suite 4800
5    Tucson, Arizona 85701

6

For the Defendant:
7

W. Eric Rau
8    Assistant Federal Public Defender
407 W. Congress Street, Suite 501
9    Tucson, Arizona 85701

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESS                                        PAGE

3    JOHN FEENEY

4    Direct examination by Mr. Davenport            13
     Cross-examination by Mr. Rau                   21
5    Redirect examination by Mr. Davenport          25

6    SUSAN McCLINTOCK

7    Direct examination by Mr. Davenport            27
     Cross-examination by Mr. Rau                   30
8
     GUILLERMO LOPEZ
9
     Direct examination by Mr. Davenport            33
10   Cross-examination by Mr. Rau                   38
     Redirect examination by Mr. Davenport          39
11
     BRIAN CREGAN
12
     Direct examination by Mr. Davenport            42
13   Cross-examination by Mr. Rau                   48
     Redirect examination by Mr. Davenport          51

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2              (Call to order of court.)

 3          THE COURT:  All right.  Let's go on the record in case

 4   number 18-cr-260, the United States of America versus Alfonso

 5   Jose Mendez, Jr.  This case is on my calendar this afternoon

 6   for a sentencing hearing.

 7       Before we go any farther, can I see counsel at sidebar?

 8       (A sidebar conference was had.)

 9          MR. DAVENPORT:  Yes, Your Honor.

10          THE COURT:  This came in, I don't know if it came in

11   yesterday or the day before.  I have not read this.  It is --

12   it came in an envelope, that's the envelope it came in.  I

13   don't know who sent it, it is not signed.  So I'm not going to

14   consider this but I thought because it was received in chambers

15   you all should have an opportunity to see this letter.  In

16   fact, I think I've got copies for each of you.

17          MR. RAU:  Thank you.  Your Honor, just to let the

18   court and Mr. Davenport know, Mr. Mendez received a copy of the

19   letter also and he texted me a photo of this.  I have a

20   printout.

21          THE COURT:  I did not look at the letter.  It's not

22   signed.

23          MR. RAU:  No, that's fine.

24          THE COURT:  I don't know who sent it but it's because

25   -- because I don't know who sent it and I didn't even read the
```

1    letter, quite frankly, but I wanted you to be aware of the

2    contents of this letter.

3              MR. RAU:  Thank you.  And, Your Honor, I need to let

4    the court know there is somebody who's present in the courtroom

5    seated in the front row of the gallery, it's the

6    African-American woman with the sort of purplish dyed hair.

7    She was taking photographs of Mr. Mendez and his wife when we

8    were going through security downstairs on the first floor and

9    she was videotaping in the corridor of the courtroom.

10        Mr. Mendez's sister-in-law, his wife's sister, Betty, who

11   is one of the letter writers confronted her outside and she

12   came in and she was rather aggressive and I informed the

13   marshals and that's why there was courthouse security officers

14   here in the courtroom.  But I wanted to let the court know that

15   that had taken place.

16             THE COURT:  Tiffany came in and talked to my JAA.

17             MR. DAVENPORT:  I have no problem with them being on

18   high alert.  I'm not looking for a spectacle.

19             MR. RAU:  All right.

20             THE COURT:  So I will also tell you before we go any

21   further, this is a somewhat of a difficult case for me because

22   I get the feeling there's a lot more going on in this case than

23   is in the record.  I will tell you that.  I'm troubled by that,

24   quite frankly.  You all have -- I did not see a sentencing

25   memo.  Did you file one?

1          MR. DAVENPORT:  I filed the objections and to some

2    extent --

3          THE COURT:  Well, I saw your objections and I saw your

4    responses.

5          MR. DAVENPORT:  Yeah.  And to some extent, the part

6    here that is the frustrating, and I recognize that, and I know

7    Mr. Rau has taken me to task a little bit on the scope of the

8    investigation versus what ultimately got charged.

9          THE COURT:  We'll call it an objective -- not

10   objective, an aggressive sentencing memorandum.

11         MR. DAVENPORT:  And I appreciated it and I take no

12   issue with Mr. Rau, I enjoy him very much and I want him to be

13   an aggressive advocate for his client.

14      This is one where it really exposes the issue with the

15   prison cases.  I have a lot of conduct that goes to the issue

16   of interaction with prisoners.  Most of the prisoners in that

17   penitentiary are sex offenders doing significant amount of

18   time.

19         THE COURT:  But this is the facility out on south

20   Wilmot?

21         MR. RAU:  Yes.

22         MR. DAVENPORT:  Yes.

23         THE COURT:  I've been there.

24         MR. DAVENPORT:  So we have a built-in credibility

25   issue.

1          THE COURT:  Yeah.  And then part of the reason I tell

2     you that, I will tell you, I haven't made a final decision but

3     as I walk in here, based upon what I've read so far and heard,

4     and I'm leaning toward placing this defendant on probation

5     probably for three years, not two, but going into it, that's

6     what I'm looking at.

7          Mr. Davenport, you may strongly object.  I understand if

8     you do.  And you're going to get to present witnesses if you

9     want, you're going to get to present and make argument but I

10    will tell you that going into the hearing, I'm probably going

11    to place this defendant on probation, and part of the reason is

12    I get the distinct feeling I don't have all the -- there's a

13    lot more going on here.

14          MR. DAVENPORT:  Well, and I'll --

15          THE COURT:  It's not to diminish the fact that he

16    committed perjury and it's clearly a serious offense but, in

17    view of all the circumstances, that's probably what I'm going

18    to do.  I don't know what the government's going to suggest.

19    I'm not trying to put you in a tough spot.

20          MR. DAVENPORT:  No, Your Honor.  And the issue also

21    is, and I think I explained this to Eric.  This is a case where

22    I had a lot of 80 percent cases where ultimately I thought that

23    there was -- there wasn't a case that was -- that got all the

24    way, and so I focused on the staff conduct, and that's why

25    we're here.  And I acknowledge that and I recognize that that

1    is going to -- that is a hit I take and I've confined myself,

2    the witnesses will largely confine themselves to contesting

3    things in the sentencing objections and the sentencing

4    memorandum.

5              THE COURT:  So are the witnesses your witnesses?

6              MR. DAVENPORT:   My witnesses.

7              MR. RAU:  They're his.  And I'm going to say that,

8    honestly, I object to all four of the witnesses named on the

9    grounds of relevance.  I did mention them in the sentencing --

10   in the objections to the presentence report because they were

11   listed in the disclosure, some of them were related to the

12   charge in Count 1 that's dismissed as part of the plea

13   agreement in this case.

14       Probation discussed factual issues.  I made objections to

15   those, the government responded, and indicated that it was

16   going to present testimony from those witnesses.  My position

17   is still that that's actually irrelevant because it's not

18   related to the perjury charge to which he pled guilty for which

19   Your Honor is sentencing him today.

20       We're going to argue 3553(a) factors but I think that

21   there's not -- the relevance to that is so tenuous and I can

22   say, in all honesty, that the government disclosed thousands of

23   pages of disclosure and that for every allegation, there is

24   evidence in there that counteracts that allegation; for every

25   factual accusation that somebody in the disclosure made,

somebody else contradicts that; or even if three people are

accusing something that was done wrong, they all contradict

each other and what was done wrong or how it was done wrong.

　　And so I think that there's a tremendous amount of smoke.

I know the government believes there's fire behind the smoke.

My position is that even if there is, it's irrelevant to the

issue of perjury.

　　　　　THE COURT:  If you have witnesses you want to call,

I'm going to allow you to call those witnesses.

　　　　　MR. DAVENPORT:  Yes.

　　　　　THE COURT:  I'm not going to limit you.  I'll have to

determine whether it's relevant or not.

　　　　　MR. RAU:  Okay.

　　　　　THE COURT:  Or, if it's relevant, how important it is

to the issues I have to decide.

　　　　　MR. RAU:  And I'll raise the objection with each

witness.

　　　　　THE COURT:  You can do that, I'll just note a standing

objection.

　　　　　MR. RAU:  Okay, yes, okay.

　　　　　THE COURT:  And then things may move a lot quicker.

　　　　　MR. RAU:  Okay, that's fine.

　　　　　MR. DAVENPORT:  We'll take it as a standing objection.

　　　　　MR. RAU:  I'm fine with that.

　　　　　MR. DAVENPORT:  Okay.

1          THE COURT:  You can do that at the start of each

2     witness and then that way we won't have to go through Q and A

3     and objection as to each one.

4          MR. RAU:  Okay.

5          MR. DAVENPORT:  All right.  And, Your Honor, just so

6     it's absolutely clear, I don't know if you have a copy of his

7     objections but I'm actually going to -- I'll say this is the

8     page I'm referring to, this is the allegation.

9          MR. RAU:  Okay.

10         MR. DAVENPORT:  So that there's some clarity.

11         THE COURT:  Let me ask you one last thing.  One of

12    your objections, though, did deal with the guidelines.  It

13    looks to me like the final presentence report addressed your

14    issue and then you objected.

15         MR. DAVENPORT:  I objected because I think that the --

16         THE COURT:  Two-level enhancement --

17         MR. DAVENPORT:  Is appropriate and the first witness

18    will deal with that.

19         MR. RAU:  And I think -- I don't think I objected to

20    the guideline calculations.

21         MR. DAVENPORT:  I don't think you did.

22         MR. RAU:  I didn't have any objections to guideline

23    calculations.

24         THE COURT:  I just assumed -- I didn't look at the

25    draft.  I assumed that there was am objection -- I assumed that

```
 1   the draft had the two-level enhancement.

 2            MR. RAU:  No, it did not.  Probation did not find the

 3   enhancement.

 4            MR. DAVENPORT:  And so I'm seeking the two-level

 5   enhancement.

 6            THE COURT:  Okay.

 7       (The sidebar conference was concluded.)

 8            THE COURT:  All right.  Let's get appearances on the

 9   record.  I think I neglected to do that.

10       Mr. Davenport, you want to put your appearance on the

11   record?

12            MR. DAVENPORT:  Gordon Davenport for the United

13   States.

14            THE COURT:  Good afternoon, Mr. Davenport.

15            MR. RAU:  Good afternoon, Your Honor.  Eric Rau on

16   behalf of Alfonso Jose Mendez, Jr.  Mr. Mendez is present out

17   of custody seated to my left.  He speaks English.  Also present

18   in the courtroom are members of his family who are in the

19   gallery to Your Honor's left.

20            THE COURT:  Good afternoon, Mr. Rau.

21       Do you want to call your witnesses first at this point?  At

22   some point, I'm going to ask you to come forward, Mr. Rau, with

23   your client, I'm going to go through the colloquy on the change

24   of plea.  I don't know what order you all want to proceed.  I'd

25   just as soon hear the testimony now if you want to call your
```

1   witnesses, Mr. Davenport.

2           MR. DAVENPORT:  That's fine, Your Honor.

3           THE COURT:  Before we do, though, I'm sorry.

4       Ms. Lopez, let's get your appearance on the record.

5           PROBATION:  Good afternoon, Your Honor.  Tara Lopez,

6   US Probation.

7           THE COURT:  Good afternoon.

8           MR. DAVENPORT:  And, Your Honor, just as it kind of

9   relates to the unsigned letter we dealt with -- you

10  distributed, Mr. Ayers is here, he was the person whose case it

11  was when there was a perjury allegation.  We've been treating

12  him as a quasi witness, a quasi victim even though he's not

13  statutorily so, so putting that on the record.

14          THE COURT:  All right.  We'll have the record reflect

15  that he is present.

16      You want to call your first witness, Mr. Davenport?

17          MR. DAVENPORT:  Yes, Your Honor.  John Feeney, please.

18          THE COURT:  Mr. Feeney, if you'd come forward.

19          MR. DAVENPORT:  We have him outside in the side room,

20  Your Honor.

21          THE COURT:  Mr. Feeney, if you'd please come forward.

22  I need you to stand in front of this young lady right here,

23  raise your right hand.  She's going to administer an oath to

24  you.

25

```
 1              JOHN FEENEY, WITNESS, WAS SWORN.

 2         THE COURT:  All right, Mr. Feeney, if you'd come

 3    around to your right and take a seat over here in the witness

 4    chair.

 5         CLERK:  And if you can please state your full name,

 6    spell your last name for the record, please.

 7         THE WITNESS:  John Feeney, F-e-e-n-e-y.

 8         MR. RAU:  And, Your Honor, at this point, I would like

 9    to object to the government's use of the testimony of

10    Mr. Feeney as irrelevant and unrelated to the charge to which

11    Mr. Mendez has pled guilty of perjury.  Mr. Feeney does not

12    have information to offer and I do not believe any other

13    information he has is useful to the court's consideration under

14    18 USC, Section 3553(a).

15         THE COURT:  All right.  Let's note the defendant's

16    standing objection to Mr. Feeney testifying.  That objection is

17    overruled.

18      Go ahead, Mr. Davenport.

19                    DIRECT EXAMINATION

20   BY MR. DAVENPORT:

21   Q.  Sir, could you introduce yourself to the judge, please?

22   A.  I'm sorry?

23   Q.  Sir, could you introduce yourself to the court?

24   A.  My name is John Feeney.  I'm presently employed with the

25   Maricopa County Sheriff's Office.  I've been there for about
```

1  two years.  Prior to that, I was a special investigative agent

2  here in Phoenix and in five other facilities.

3  Q.  Okay.  What were those other facilities?

4  A.  Let's see, I started out in Lompoc, California, I

5  transferred to Atlanta, Georgia; Safford, Arizona; Springfield,

6  Missouri; Manhattan, New York; Allenwood, Pennsylvania;

7  Pollock, Louisiana; and then Phoenix, Arizona, is where I

8  finished.

9  Q.  And based on your history, are you familiar with the duties

10 and responsibilities of what we've been calling an SIA?

11 A.  Yes, sir.

12 Q.  Could you tell the court what an SIA is?

13 A.  An SIA is a special investigative agent.  They're pretty

14 much the chief law enforcement officer at a facility.  They

15 conduct investigations of inmate activities for administrative

16 reasons and for criminal reasons.  They also investigate staff

17 for the same things, criminal and administrative matters.

18 Q.  So for a sense of perspective, how many SIAs, just

19 approximately, would you say are in the United States?

20 A.  There are about 30.

21 Q.  And how many total BOP facilities are in the United States?

22 A.  There's over 100.

23 Q.  And about estimating, how many total prisoners are there in

24 the United States?

25 A.  200,000.

 1   Q.  Okay.  So we're talking the 30 people that are -- would it

 2   be fair to call them the internal affairs?

 3   A.  Yes.

 4   Q.  As a part of that duty, is it advising the warden on staff

 5   issues?

 6   A.  It is, a large part of it.

 7   Q.  Is a part of that duty supervising what's called the SIS

 8   office?

 9   A.  Yes.

10   Q.  And can you tell us what SIS is?

11   A.  SIS is the special investigation services, the

12   investigative component of the prison.  They're the ones who

13   basically track the inmates, listen to the inmates, communicate

14   with the inmates.

15   Q.  Okay.  Now, is it important to tell the truth or especially

16   important to tell the truth when you're an SIA?

17   A.  Absolutely.

18   Q.  Can you explain why?

19   A.  You're -- have the most knowledge of any situation, whether

20   it's something that occurred with the inmates, such as a

21   stabbing, or an officer that's maybe being alleged to do

22   something wrong.  You're the one who has the most firsthand

23   information and you're the one conducting the briefings with

24   the warden who runs that facility.

25        So you develop this relationship with the warden.  He

1   dictates how his facility is going to run.  You are like the

2   operations officer who makes it run that way.  So he's

3   essentially counting on you to be honest, to provide honest,

4   factual information to him at all times in order to make

5   decisions.

6   Q.  As a part of SIA duties, do your investigations sometimes

7   deal with high visibility cases, such as prison sexual

8   assaults?

9   A.  Yes, they do.

10  Q.  Do they deal with murders?

11  A.  Yes.

12  Q.  Do they deal with civil rights cases?

13  A.  They do.

14  Q.  And is your work, when you're an SIA, sometimes important

15  to the initial response on those cases?

16  A.  It is.

17  Q.  As an SIA, are you asked to testify in court?

18  A.  You are.

19  Q.  And is that part of your duties?

20  A.  It is.

21  Q.  As an SIA, are you sometimes called, in your role as a

22  supervisor, to conduct supervisory activities and to testify

23  regarding employee matters?

24  A.  Yes, you are.

25  Q.  And can we -- is it especially important for an SIA to be

1    truthful in those matters?

2    A.  It is.

3    Q.  Based on your -- in your experience, based on your word

4    alone, have you been able to negatively affect people's careers

5    or livelihood?

6    A.  I have.

7    Q.  Okay.  And is that true generally for SIA?

8    A.  It's true for all of them, yes.

9    Q.  Okay.  And with regard to most of the line prison guards,

10   can you -- could you do that to them?  Could you, if you lied,

11   could you affect their careers?

12   A.  Absolutely.  My say-so would -- could result in them being

13   investigated for criminal activity, it could be responsible for

14   an administrative investigation where they were suspended, or

15   it could result in nothing occurring in some cases.

16   Q.  Did you -- was Mr. Mendez an SIA?

17   A.  Yes.

18   Q.  Since you were in Phoenix, he was in Tucson, did you have

19   any dealings with him?

20   A.  I did.

21   Q.  Did you know him a long time?

22   A.  Yes.

23   Q.  Okay.  If you had to estimate, plus or minus?

24   A.  I would say approximately 10 years.

25   Q.  Okay.  Did you ever encounter a situation where you became

1    concerned with Mr. Mendez's credibility even before these

2    incidents?

3    A.  I did.

4    Q.  Okay.  Can you tell us about that?

5    A.  I was contacted by the facility in Tucson.  They had

6    switched wardens.  My warden who was at Phoenix had been

7    transferred to Tucson, Tucson warden had been transferred to

8    where I was.  The -- my old warden, who was in Tucson, made

9    contact with me and asked me to speak to Mr. Mendez about

10   providing reports and reporting information both timely and

11   accurately.

12   Q.  And did you have such conversation?

13   A.  I did.

14   Q.  How long of a conversation would you say it was?

15   A.  We talked for, say, less than an hour, but it was for a

16   minute.

17   Q.  Okay.  And you're using "minute" in the kind of colloquial

18   sense?

19   A.  Yes, sir.

20   Q.  Okay.  And in that, did you emphasize the importance of

21   candor to Mr. Mendez?

22   A.  I did.

23   Q.  Did you talk about how that candor related to his job as an

24   SIA?

25   A.  Yes.  And particularly regarding how that warden expected

1   the information to flow and following up on things that you

2   have told him previously.

3   Q.  Were you involved in the 2014 matter where they searched

4   the SIS office?

5   A.  No, sir.

6   Q.  Okay.  What was your role -- did you have any connection to

7   it later?

8   A.  Later I did, yes.

9   Q.  Okay.  What was your role?

10  A.  I was assigned by the regional office who supervises the

11  SIS for the western area, including Phoenix and Tucson, to

12  report to Tucson to conduct a review and to supervise matters

13  down there.

14  Q.  Okay.  Now, on page 9 of the sentencing objections, it

15  says:  Mr. Mendez asserts that SIA Feeney was called in to

16  investigate but not in a supervisory role.

17      Is that a -- to the best of your personal knowledge, a

18  true -- an accurate or inaccurate statement?

19  A.  Inaccurate.

20  Q.  Okay.  Did you have supervisory duties?

21  A.  Yes.

22  Q.  Okay.  And what were those duties?

23  A.  I was to sit in the office, I was to train other staff, I

24  was to direct other staff in what to do.  There was no

25  investigative agent there.  The people who they were bringing

1    in had a limited amount of experience.

2    Q.  Okay.  As a part of reviewing the materials at that office,

3    did you encounter anything unusual about some of the

4    investigatory materials?

5    A.  Yes.

6    Q.  What did you see that was unusual?

7    A.  I saw investigations that were internally -- internal

8    affairs cases that I felt should have had sustained charges

9    when they were not sustained by Mr. Mendez.  I also saw

10   complaints in there from inmates, some of them very lengthy,

11   five, 10 pages long, handwritten, they go into all these

12   details, but when the investigation itself was completed by

13   Mr. Mendez, the information in there was that the inmate didn't

14   want to cooperate or that he refused to be interviewed or

15   wouldn't sign a statement.

16   Q.  In your history, have you dealt with inmate complaints?

17   A.  A lot, yes.

18   Q.  Are we talking hundreds, thousands?

19   A.  Thousands.

20   Q.  Okay.  Is it common for someone to take the time to write a

21   10-page letter and then say they don't want to talk any

22   further?

23   A.  No, it's quite the opposite.

24   Q.  Okay.  And what do you mean by that, sir?

25   A.  My experience almost every time was that if an inmate took

DIRECT/CROSS-EXAMINATION - JOHN FEENEY

1    the time to hand write a long complaint, that the inmate would

2    often have -- try give you more information when you actually

3    interviewed him and completed a statement, stuff that wasn't

4    even on the paper they would remember or add or even sometimes

5    make up.

6    Q.  So also on the sentencing objection by the defense, it said

7    there were only three such alleged incidents out of

8    Mr. Mendez's approximately 2,000 case investigations.  Was that

9    consistent with what you were seeing when you were reviewing

10   the cases?

11   A.  I don't recall the exact number but my recollection is it

12   was more than three.

13   Q.  Okay.  Thank you, sir.

14        MR. DAVENPORT:  Pass the witness.

15        THE COURT:  Mr. Rau, do you have questions for this

16   witness?

17        MR. RAU:  I do.

18                    CROSS-EXAMINATION

19   BY MR. RAU:

20   Q.  Mr. Feeney, you've indicated that there are thousands of

21   investigations of this nature performed over a period of years,

22   correct?

23   A.  Correct.

24   Q.  And so during Mr. Mendez's years that you were familiar

25   with him, he would have performed thousands of these?

CROSS-EXAMINATION - JOHN FEENEY                    22

1    A.  True.

2    Q.  The 2,000 figure cited in the defense objection of the

3    presentence report was not unreasonable?

4    A.  No.

5    Q.  And you indicated you don't recall a specific number but

6    you think it was more than three that were cited to be

7    incorrect or inaccurate?

8    A.  Yes.

9    Q.  But you don't have any specifics as to numbers?

10   A.  No, I don't.

11   Q.  You don't have anything specific to contest the defense

12   objection that only three such instances were found out of

13   those thousands of reports that he did?

14   A.  The -- whatever record I had created was examined by

15   internal affairs, so I don't really recall.

16   Q.  And these interviews with these inmates who deny the

17   accuracy of Special Investigative Agent Mendez's reports were

18   conducted years later, correct?

19   A.  The interviews?

20   Q.  Yes.  When you went back or someone went back to talk to

21   these inmates about the accuracy of these reports, those

22   conversations were years after --

23   A.  I don't know that part.

24   Q.  Okay.  You didn't witness the incidents that gave rise to

25   the inmates' reports?

1    A.  Correct.

2    Q.  And you weren't privy to the conversations that they had

3    with the Special Investigative Agent Mendez?

4    A.  Correct.

5    Q.  And your position is that there were internal affairs cases

6    that should have been sustained against the BOP officers but

7    weren't?

8    A.  Correct.

9    Q.  That's your own personal opinion?

10   A.  Correct.

11   Q.  You weren't the person who did the direct investigation?

12   A.  Yes.

13   Q.  You weren't the person who talked to the inmates and the

14   other witnesses, including the officers who were the subject of

15   the complaints?

16   A.  Correct.

17   Q.  And you indicate that the inmates' complaints were long but

18   that Special Investigative Agent Mendez's reports were short?

19   A.  No.  My recollection of it was there was long inmate

20   complaints, handwritten, and that when I reviewed the files,

21   there was typical responses, and out of the files that I

22   reviewed, let's say I reviewed 50 files, the ones that had

23   inmate complaints in there that were handwritten, nearly all of

24   them, the inmate refused to make a statement to Mr. Mendez or

25   similar to that.

CROSS-EXAMINATION - JOHN FEENEY

1   Q.  And you weren't present when Mr. Mendez talked to those

2   inmates?

3   A.  Correct.

4   Q.  Mr. Mendez was aware of the length of their complaints,

5   correct?

6   A.  Correct.

7   Q.  He was investigating those long complaints that they had

8   written?

9   A.  Correct.

10  Q.  And you weren't present when the inmates told him that they

11  weren't going to go forward or denied that they had written the

12  complaints?

13  A.  Correct.

14  Q.  And you testified that inmates don't normally withdraw

15  complaints?

16  A.  Correct.

17  Q.  It's not impossible for them to do so?

18  A.  Correct.  But given the number of complaints that I saw,

19  given my experience, my experience is totally the opposite.

20  Q.  But you don't know personally, based on the interactions

21  that Special Investigative Agent Mendez had with those

22  particular individuals, why he wrote that in those reports or

23  why they might have chosen to dispute the complaints that they

24  had originally filed?

25  A.  True.

1           MR. RAU:  I have no further questions.

2           MR. DAVENPORT:  Can I just ask two --

3           THE COURT:  Mr. Davenport, redirect?

4           MR. DAVENPORT:  Just briefly, Your Honor.

5                   REDIRECT EXAMINATION

6   BY MR. DAVENPORT:

7   Q.  Sir, I want to draw on your experience.  Assume for a

8   moment that the prisoner makes a 10-, 15-page handwritten

9   complaint, Mr. Mendez decides to close it and says, let's say

10  falsely, that the prisoner decided to withdraw his complaint or

11  not or to give no further statement.

12      How would that differ from what you were saying?

13  A.  It's -- it's an integrity matter.  Most inmates that you

14  talk to, they just want a chance to tell their story.  So, in

15  other words, you present them with a -- they have a handwritten

16  statement, they get to sign an official statement under oath,

17  this is what occurred.  That's their record of what occurred.

18  When you take away that factor, that chance that they have to

19  tell their story officially, it looks like you don't care.  And

20  that atmosphere inside a prison, that's very dangerous.

21  Q.  And just to make clear, from what you were observing, it

22  was the under oath witnessed by the SIA reports that were

23  indicating they had nothing further to say?

24  A.  Yes, sir.

25          MR. DAVENPORT:  Okay.  Thank you, Your Honor.  We'll

1   pass the witness.

2           THE COURT:  Mr. Feeney, you can step down.

3           THE WITNESS:  Thank you, sir.

4           THE COURT:  Counsel, may this witness be excused?

5           MR. DAVENPORT:  Yes, Your Honor.

6           THE COURT:  Mr. Feeney, you are excused.  You're free

7   to go about your business.

8           THE WITNESS:  Thank you.

9           MR. DAVENPORT:  Your Honor, we would call Susan

10  McClintock next.

11          MR. RAU:  Your Honor, would you like me to make the

12  standing objection now or after she's sworn?  Either way --

13          THE COURT:  Let's have him sworn -- let's have her

14  sworn, excuse me.  Is it Susan McClintock, was that the name?

15          MR. DAVENPORT:  Susan.

16          THE COURT:  McClintock.

17          MR. DAVENPORT:  Yes, sir.  And, Your Honor, if it's --

18  for ease, I'm willing to stipulate that the objection is made

19  on each witness.

20          THE COURT:  Sure.

21      Ms. McClintock, if you'd come forward, ma'am.  Let's wait

22  until she's sworn and she's on the stand and you can make your

23  objection for the record.

24      Ms. McClintock, I'm going to ask you to please raise your

25  right hand and this lady here is going to administer an oath to

1   you.

2                   SUSAN McCLINTOCK, WITNESS, WAS SWORN.

3                   THE COURT:  All right, ma'am, if you'd come around to

4   your right, take a seat over here in the witness chair.

5                   CLERK:  And then if I could please have you state your

6   full name and spell your last name for the record.

7                   THE WITNESS:  Susan McClintock, M-c-C-l-i-n-t-o-c-k.

8                   CLERK:  Thank you.

9                   THE COURT:  Go ahead, Mr. Davenport.

10                  MR. RAU:  At this point, I will object to the

11  testimony of Ms. McClintock.  It is irrelevant and unrelated to

12  the count at which the court is sentencing Mr. Mendez.   In

13  addition, any testimony that she has has no bearing on any of

14  the 18 USC, Section 3553 factors that the court must consider

15  in imposing sentence.

16                  THE COURT:  All right.  Let's note defendant's

17  objection.  The objection is overruled.  And we'll note a

18  standing objection this same basis on all the questions being

19  asked by Mr. Davenport this afternoon.

20      Go ahead, sir.

21                          DIRECT EXAMINATION

22  BY MR. DAVENPORT:

23  Q.  Ma'am, could you introduce yourself to the court, please?

24  A.  My name is Susan McClintock.  I'm a retired warden at FCC

25  Tucson.

1    Q.  How long were you with BOP?

2    A.  27 years.

3    Q.  And in that capacity, did you have various jobs?

4    A.  Yes.

5    Q.  What were those jobs?

6    A.  I started as a correctional officer and worked my way

7    through the bureau as a safety trainee and specialist, manager,

8    an evaluations specialist in central office, camp

9    administrator, associate warden, and warden.

10   Q.  In that capacity, did you know Mr. Mendez?

11   A.  Yes.

12   Q.  Okay.  When and when?

13   A.  The first time I met Mr. Mendez was when I entered the

14   bureau in July of 1990 as a correctional officer at FCC Tucson

15   and then we worked together for the second time when I came

16   back to Tucson as associate warden and then when I returned to

17   Tucson as warden, he was also there at the same time.

18   Q.  And in that capacity, did you deal with him as an SIA?

19   A.  Yes.

20   Q.  Ma'am, and for the court's benefit, page 6 of the

21   sentencing objections by the defense, 6 through 13, I'm going

22   to read a statement and I want to understand from you whether

23   it's accurate or not.

24       Although the government waited until 2018 to charge

25   Mr. Mendez in the instant case with having made a false

1  statement to SA Cregan in that 2016 investigation, specifically

2  his denying a conversation that Mr. Mendez allegedly had with

3  Warden Susan McClintock concerning Warden Wynn's hard drive.

4  Mr. Mendez firmly denies that change.  He avidly maintains that

5  he never had such a conversation with the warden and that he

6  told SA Cregan the truth.

7      Is that correct?

8  A.  No.

9  Q.  Okay.  Can you tell us what happened?

10 A.  Yes.

11 Q.  Do you remember a conversation or conversations with

12 Mr. Mendez about him possessing Warden Wynn's hard drives?

13 A.  Yes, I do.

14 Q.  Okay.  Tell us to the best of your recollection where and

15 when that conversation was held.

16 A.  The first conversation was when I first returned to Tucson

17 as warden, it was the end of 2014 or the beginning of 2015.  He

18 came to my office, sat down in front of my desk, and placed a

19 red folder on the desk, slid it over and opened it, and they

20 were pictures of computer hard drives.  He told me that Warden

21 Wynn, the former warden, was out to get him and that there was

22 evidence on his hard drives and that Warden Wynn had had the

23 computers destroyed when he left, and that Mendez had recovered

24 the hard drives and these were supposedly pictures of the hard

25 drives.  That was the first conversation.

1   Q.  Okay.  I gather by the fact that you called it the "first

2   conversation" that there was at least one more conversation.

3   Tell us about that, please.

4   A.  So, after I announced my retirement, it was, I believe,

5   August of 2016, I stopped at the camp 'cause that's where

6   Mr. Mendez was assigned at the time and was speaking to him

7   about my pending retirement.  And he spoke about the ongoing

8   situation with the investigation he was under and said that he

9   had taken the hard drives and sent them out -- sent them out.

10  So the -- what I took from that is he sent them out to have

11  them read to get information off of them.  And I asked him

12  directly:  You sent them out?  And he said:  Yes.

13  Q.  Okay.  And where were you when this happened?

14  A.  We were standing out in front of the camp.

15  Q.  Okay.  At any point -- well, we'll just stick with that

16  since that was the defense assertion.

17       Thank you, ma'am.

18            MR. DAVENPORT:  Pass the witness.

19            THE COURT:  Mr. Rau, cross-examination?

20            MR. RAU:  Yes, Your Honor.  May I have a moment?

21                      CROSS-EXAMINATION

22  BY MR. RAU:

23  Q.  Ms. McClintock, just to be clear, your testimony has no

24  relevance or relation to the charge of perjury that's at issue

25  in this sentencing today, correct?

CROSS-EXAMINATION - SUSAN McCLINTOCK                31

1    A.  Not to my knowledge.

2    Q.  And the interaction that you report -- reported regarding

3    these supposed statements by Mr. Mendez, you provided that

4    information during an investigation in 2016, correct?

5    A.  I provided the information -- I was aware of the ongoing

6    investigation.  I provided the information because of the

7    conversation, not because of the investigation.

8    Q.  And you relayed the conversation to the agent who was

9    investigating at that time, correct?

10   A.  Yes.  I submitted a memo and then he came and questioned

11   me.

12   Q.  And you were aware at that time that Mr. Mendez was

13   disputing your version of the events, correct?

14   A.  No.

15   Q.  Are you aware that he disputes that he had those

16   conversations with you?

17   A.  Yes.

18   Q.  And you are aware that internal affairs never received any

19   hard drives for analysis, despite the allegation that

20   Mr. Mendez had sent them there?

21   A.  I'm not aware of any of that information.

22   Q.  You're not aware of any use of these supposed hard drives

23   for the purposes that you say Mr. Mendez claimed he was using

24   them?

25   A.  All I'm aware of is the conversation that we had and that I

1    reported it and then I was interviewed by the agent and, in

2    preparation for this trial, I was provided a copy of the

3    affidavit where I was -- he said it didn't happen.  I say it

4    did happen.  I know it happened.  He says it didn't happen.

5    But the other information you're asking me about, I have no

6    knowledge of.

7    Q.  Okay.

8         MR. RAU:  I have no further questions.

9         THE COURT:  Mr. Davenport, redirect?

10        MR. DAVENPORT:  No, Your Honor.  I ask that this

11   witness be excused.  And we're prepared to call our next

12   witness.

13        THE COURT:  Ms. McClintock, you're excused.  You may

14   go about your business.

15        THE WITNESS:  All right.  Thank you, sir.

16        MR. DAVENPORT:  And we would call Guillermo Lopez.

17        THE COURT:  Mr. Lopez, if you'd please come forward,

18   sir.  If you'll come around and stand in front of this lady

19   here, she's going to administer an oath to you so I'll ask you

20   to please raise your right hand.

21             GUILLERMO LOPEZ, WITNESS, WAS SWORN.

22        THE COURT:  All right.  Sir, if you'd come around to

23   your right and take a seat over here in the witness chair.

24        CLERK:  And if you can please state your full name and

25   spell your last name for the record.

1            THE WITNESS:  Guillermo Lopez, L-o-p-e-z.

2            CLERK:  Thank you.

3            MR. RAU:  And, Your Honor, at this point --

4            THE COURT:  Go ahead.  I'm sorry.

5            MR. RAU:  Your Honor, at this point, I will object to

6    the use of Mr. Lopez's testimony as irrelevant.  And, in

7    addition, it is unrelated to the perjury charge at issue before

8    the court.  And it has no bearing and provides no information

9    under 18 USC, Section 3553.

10           THE COURT:  We'll note the defendant's standing

11   objection to any questions being asked of this witness.  That

12   objection is overruled.

13       Go ahead, Mr. Davenport.

14                         DIRECT EXAMINATION

15   BY MR. DAVENPORT:

16   Q.  Mr. Lopez, could you introduce yourself to the court,

17   please?

18   A.  My name's Guillermo Lopez.

19   Q.  And what do you do for a living?

20   A.  I'm a special investigative services technician at the

21   Federal Correctional Complex in Tucson, Arizona.

22           THE COURT:  I'm sorry.  I did not hear the answer.

23           THE WITNESS:  I'm an SIS technician, special

24   investigative services technician.

25           THE COURT:  All right.  Thank you.

1    BY MR. DAVENPORT:

2    Q.  How long have you been that?

3    A.  Since 2011.

4    Q.  And before that, what was your job?

5    A.  I was a senior officer specialist right there at the

6    Federal Correctional Complex.

7    Q.  Okay.  And what is a senior officer specialist?

8    A.  It's basically one of the more seasoned staff around that

9    is a mentor to some of the newer staff.

10   Q.  Okay.  Have you always wanted to be in law enforcement?

11   A.  Yes.

12   Q.  And do you have family in law enforcement?

13   A.  I do.

14   Q.  Do you understand the importance of telling the truth?

15   A.  Yes, sir.

16   Q.  You understand the importance of integrity -- of integrity?

17   A.  Yes.

18   Q.  How do you know Mr. Mendez?

19   A.  Mr. Mendez was my supervisor in the special investigative

20   services office.

21   Q.  Okay.  And what was your relationship with Mr. Mendez?

22   A.  It was that of a subordinate and supervisor.

23   Q.  Okay.  Sir, in the defense memorandum, it says that

24   Mr. Mendez denies that he ever falsified the contents of any

25   investigative case files regarding inmate complaints or failed

DIRECT EXAMINATION - GUILLERMO LOPEZ

```
 1   to take sworn statements when inmates wished to provide them
 2   during the many years as an SIA.
 3       Do you have any knowledge whether that is an accurate or
 4   inaccurate statement?
 5   A.  He did falsify documents, yes.
 6   Q.  Sir, how do you, based on your personal knowledge, know
 7   that?
 8   A.  On a particular occasion, another staff member was the
 9   subject of an investigation.  The staff member in question was
10   brought in and he had my affidavit already filled out.
11   Q.  So let's be very specific here.  When you say "he", who had
12   your affidavit?
13   A.  Mr. Mendez.
14   Q.  And was your affidavit completed?
15   A.  Yes.
16   Q.  Had you given any interview in that case?
17   A.  No.
18   Q.  And were you directed to sign it?
19   A.  Yes.
20   Q.  And was that the -- and what type of case was this?
21   A.  It was pertaining to abuse of an inmate.
22   Q.  And, sir, I'm going to be real clear.  Have I made any
23   promises to you?
24   A.  No.
25   Q.  Have I -- I have indicated I'm not interested in you,
```

1   correct, criminally?

2   A.  Correct.

3   Q.  But you understand you can suffer fairly significant

4   employment consequences for what you just admitted to?

5   A.  Correct.

6   Q.  And you're aware of that?

7   A.  Yes, sir.

8   Q.  Sir, did you observe or participate at any point in

9   Mr. Mendez involving himself in an investigation?

10  A.  Yes.

11  Q.  Okay.  Can you tell us what happened then?

12  A.  On one particular occasion, I received a phone call from

13  Mr. Mendez.  It pertained to a staff member.  The way it was

14  presented, it was to warn the staff member as if his safety was

15  in jeopardy and then I informed the staff member that,

16  essentially, that the inmate was a danger to him.

17  Q.  Okay.  And what was that staff member's name?

18  A.  Cody Hunter.

19  Q.  Okay.

20          MR. DAVENPORT:  And, Your Honor, I'd ask you to take

21  judicial notice of CR 16-01160.  That would be the case where

22  Mr. Hunter was prosecuted.

23          THE COURT:  Is there any objection to that, Mr. Rau,

24  other than the standing objection to relevance?

25          MR. RAU:  Other than the standing objection to

1   relevance, no.  And I will be making reference to that case in

2   my sentencing argument.

3              THE COURT:  Okay.  Go ahead, Mr. Davenport.

4   BY MR. DAVENPORT:

5   Q.  And, specifically, it would be page 10, just so we're

6   100 percent clear.  There's a section that says:  Subsequent to

7   my discussion with the inmate, I received information that the

8   inmate was cooperating with law enforcement officials.

9       Did you have a subsequent conversation with Mr. Mendez

10  after you delivered that message?

11  A.  Yes.

12  Q.  What did he tell you?

13  A.  Basically, he called to follow up to make sure I had

14  delivered the message.

15  Q.  Okay.  Let's -- Mr. Rau has pointed out not all of these

16  deal with the perjury case.  So let's take it back specifically

17  to Mr. Ayers' case.

18      Were you interviewed as a part of that employment case?

19  A.  I was.

20  Q.  Did Mr. Mendez have any discussions with you about what

21  your testimony would be in that case?

22  A.  Yes, he instructed me to provide my statement to him.

23  Q.  Okay.  After you provided your statement, was there any

24  questions about what he -- did he provide any questions or

25  inquire or follow up after?

1   A.  No, not pertaining to that.  On a separate occasion he did.

2   Q.  What was that separate occasion?

3   A.  Regarding an investigation to the SIS office.

4   Q.  And did you, in any way, feel threatened or intimidated

5   with regard to the Ayers case?

6   A.  Yes.

7   Q.  And did you feel that if you provided certain information,

8   that would go badly for you?

9   A.  Yes.

10  Q.  And, as a result of that, were there factual things that

11  you knew or were asked about that you did not provide?

12  A.  Yes.

13  Q.  And was the source of that concern, that threat or

14  intimidation, Mr. Mendez?

15  A.  Yes.

16  Q.  Okay.

17          MR. DAVENPORT:  Pass the witness.

18          THE COURT:  Mr. Rau, cross-examination?

19                      CROSS-EXAMINATION

20  BY MR. RAU:

21  Q.  Mr. Lopez, you claim that you felt threatened or

22  intimidated during all of this supposed falsification of

23  reports and statements, correct?

24  A.  Yes.

25  Q.  You didn't report SIA -- SIA Mendez to outside law

1   enforcement authorities, did you?

2   A.  No, sir.

3   Q.  You didn't go to any higher ups in the prison to report

4   anything that you claim was improper, correct?

5   A.  Correct.

6   Q.  And, according to what you say, that Special Agent Mendez

7   directed you to make a call to Officer Cody Hunter about an

8   inmate he was dealing with who was actually an informant, you

9   were actually the person who made the call, correct?

10  A.  Yes.

11            MR. RAU:  I have no further questions.

12            THE COURT:  Mr. Davenport, redirect?

13            MR. DAVENPORT:  Redirect?

14                      REDIRECT EXAMINATION

15  BY MR. DAVENPORT:

16  Q.  Sir, why didn't you report it?

17  A.  Under those circumstances at that time with Cody Hunter, I

18  was unaware that Cody Hunter was under an investigation.

19  Q.  Would the SIA know the investigation?

20  A.  Yes.

21  Q.  Okay.  Sir, why didn't you report Mr. Mendez to outside law

22  enforcement?  It seems like you have multiple instances that

23  would have given someone concern.

24  A.  Like I said, it was in fear of retaliation.

25  Q.  Did Mr. Mendez have any bubbles, trinkets, trophies to

1    commemorate all the people that he had removed from BOP

2    employment?

3              MR. RAU:  Your Honor, I'm going to object to this as

4    outside the scope of cross-examination and to relevance.

5              THE COURT:  Overruled.  Answer the question if you

6    can.  I'll decide how relevant it is or whether it's got any

7    probative value.

8         Go ahead.

9              THE WITNESS:  Yes.

10   BY MR. DAVENPORT:

11   Q.  Could you tell us what those were?

12   A.  Off in the office next to a dry erase board, there was

13   chits of staff members that he had had terminated.

14   Q.  So when you say "chit", is it a little thing that each

15   person gets as an identifier?

16   A.  Correct.

17   Q.  And so when someone was fired, would he save it?

18   A.  Yes.

19   Q.  So if you were in his office, would you see the line of

20   people that he had gotten fired?

21   A.  Yes.

22   Q.  Okay.

23              MR. DAVENPORT:  Pass the witness.

24              THE COURT:  Counsel, may this witness be excused?

25              MR. RAU:  Yes, Your Honor.

1          THE COURT:  Mr. Lopez, you're excused.  You're free to

2    go about your business.

3          THE WITNESS:  Thank you.

4          THE COURT:  Mr. Davenport, if you'll call your next

5    witness.

6          MR. DAVENPORT:  Yes, Your Honor.  The government calls

7    Brian Cregan.

8          THE COURT:  Mr. Cregan, if you'd come forward, sir.  I

9    need you to come over here and stand in front of this lady and

10   raise your right hand.  She's going to administer an oath to

11   you.

12               BRIAN CREGAN, WITNESS, WAS SWORN.

13         THE COURT:  All right.  Mr. Cregan, if you'd take a

14   seat in the witness chair.

15         CLERK:  And if you can please state your full name and

16   spell your last name for the record.

17         THE WITNESS:  Brian Cregan, C-r-e-g-a-n.

18         CLERK:  Thank you.

19         MR. RAU:  Your Honor, at this point, I will object to

20   Mr. Cregan's testimony on grounds, first, that it is irrelevant

21   to the charge at issue.  The charge to which his investigation

22   related has been dismissed under the agreement Mr. Mendez has

23   entered into.  In addition, it's irrelevant and not probative

24   of any factor under 18 USC, Section 3553 for the court to

25   consider.

1          THE COURT:  All right.  We'll note the defendant's

2     objection.  The objection is overruled.

3          MR. DAVENPORT:  May I proceed, Your Honor?

4          THE COURT:  Yes, sir, go ahead.

5                     DIRECT EXAMINATION

6     BY MR. DAVENPORT:

7     Q.  Sir, could you introduce yourself to the court, please?

8     A.  My name is Brian Cregan.  I'm a special agent with the

9     office of internal affairs.

10    Q.  How long have you been a special agent?

11    A.  12 years.

12    Q.  And where are you based?

13    A.  Butner, North Carolina.

14    Q.  And, as a part of your duties, do you go to prisons all

15    over the United States?

16    A.  Yes.

17    Q.  Just in the last two weeks, where have you been?

18    A.  I've been to St. Louis and I've been to La Tuna, Texas.

19    Q.  Okay.  Before that, did you hold positions inside a BOP

20    facility?

21    A.  Yes, I did.

22    Q.  What kind of positions were those?

23    A.  I was a correctional officer at the Federal Medical Center

24    in Lexington, Kentucky; I was a lieutenant in the Federal

25    Prison Camp in Duluth, Minnesota; and also the SIS lieutenant

1    at the FPC in Duluth, Minnesota; I was a lieutenant at FCI

2    Gilmer, West Virginia; and also the SIS lieutenant at FCI

3    Gilmer.  And I was the special investigative agent at the

4    United States Penitentiary in Lee County, Virginia.

5    Q.  And that would be the SIA, right?

6    A.  Yes.

7    Q.  That would be the same position that Mr. Mendez had?

8    A.  Yes.

9    Q.  Okay.  What involvement -- so let me back up.

10        For all of us that may not know the flow chart for BOP,

11   what component of BOP do you work for?

12   A.  I work for the office of internal affairs, directly for the

13   director of the Bureau of Prisons.

14   Q.  Okay.  And, as a part of that office, did you have or what

15   involvement have you had with Mendez in the past?

16   A.  I've interviewed Mr. Mendez three times.

17   Q.  Okay.  So I want to address a couple of things that came up

18   in the sentencing objections by the defense.  First, there

19   seems to be, looking at page 4, Mr. Mendez, and I'm looking at

20   lines 21, said the following:  He asserts -- meaning Mendez --

21   that his last day of work in the SIS office was Friday,

22   January 17th, 2014.  He was away on vacation in Rocky

23   Point/Puerto Penasco, Sonora, Mexico, for the Martin Luther

24   King holiday weekend when OIG staff searched the SIS office at

25   FCC Tucson on Monday, January 20th, 2014.

1      Investigator -- investigation revealed no officer was

2   actually assigned to work in the SIS office at the maximum

3   security USP Tucson facility over that weekend.

4      I want to just take a couple of things.  There seems to

5   have been -- whether or not he was there, was Mr. Mendez

6   responsible for -- as an SIA?

7   A.  For the office itself?

8   Q.  Yes.

9   A.  Yes.  As an SIA, he is responsible for the special

10   investigative supervisor's office.

11   Q.  Okay.  Before today, did you review the duty roster of that

12   weekend?

13   A.  Yes.

14   Q.  Did you find out whether or not the statement of

15   investigation revealed that no officers were actually assigned

16   to work in the SIS office at the maximum security USP Tucson

17   facility over that weekend was an accurate or inaccurate

18   statement?

19   A.  There were staff assigned.

20   Q.  Okay.  Then on page 5, it moves to what appears to be kind

21   of a soft allegation of a setup.  BOP staff witnesses have

22   attested that Lieutenant Charles Ayers, whose 2014 EOC

23   complaint resulted in the deposition or deposition of

24   Mr. Mendez at issue in the instant case and another lieutenant

25   who was also hostile to Mr. Mendez received lengthy private

**DIRECT EXAMINATION - BRIAN CREGAN**

1    access to the unmanned SIS office at the orders of Warden Lewis

2    Wynn who, in parentheses, who also had an antagonistic

3    relationship towards Mr. Mendez, close parentheses, on

4    Saturday, January 18th, 2014, two days before OIG unexpectedly,

5    in parentheses, descended and discovered the numerous alleged

6    violations described in the PSR.

7        Is that -- so I want to just deal with a couple of things.

8    As a part of your investigation, did you look in whether or not

9    Mr. Ayers and other individuals had key or SIS office access?

10   A.  Yes.

11   Q.  What did you find out?

12   A.  Mr. Ayers had no access to the office.  The keys that were

13   originally issued to him prior to his removal from office were

14   secured in the lock shop.

15   Q.  Okay.  And that was true of the January 18th day?

16   A.  Yes.

17   Q.  Okay.  Now, the allegation is that -- the unexpectedly

18   suggests that there was some awareness of the warden about the

19   oncoming inspection.  When did you let the warden know you were

20   going to inspect the office?

21   A.  It would have been the evening of the 19th, roughly 7:00 or

22   8:00 p.m. when we showed up in town.  We had made our travel

23   plans, showed up in town, and, at that point, my supervisory

24   agent called the warden to the Starr Pass Resort.  We briefed

25   him on the patio there.  He had no knowledge of what we were

**DIRECT EXAMINATION - BRIAN CREGAN**

1    going to do or when we were going to do it until that point.

2    Q.  And then what time did you actually search the office?

3    A.  Midnight.

4    Q.  So five hours later?

5    A.  Yes.

6    Q.  Okay.  So would it be fair to say that the warden, to the

7    best of your knowledge, didn't have any knowledge about the

8    search on January 18th, 2014?

9    A.  Yes.

10   Q.  They raise the issue that, apart from speaking with

11   Mr. Mendez, OIA investigators never interviewed Lieutenant

12   Ayers or any other lieutenant or anyone else from SIS to

13   determine who actually was responsible for the violations the

14   OIG had encountered.

15       Is that correct?

16   A.  No.  There were other agents that had interviewed Ayers; I

17   did not.  But I did interview other staff assigned to the SIS

18   office.

19   Q.  Okay.  And as -- was one of the results of the report and

20   investigation you reviewed, you determined that Mr. Mendez had

21   not been candid with you with regard to his responsibility for

22   the office?

23   A.  Yes.

24   Q.  It says here that you refused to provide Mr. Mendez

25   requested copies of the videotape of OIG's January 20th, 2014,

**DIRECT EXAMINATION - BRIAN CREGAN**

1    search of the SIS office or their own OIA report.  Again from

2    the defense objections.

3        Why is that, sir?

4    A.  I don't provide copies of the documents used in discipline.

5    Mr. Mendez, in his position, is fully aware that the servicing

6    human resource manager would provide any documents to him for

7    any pending discipline, much like we would with any other

8    staff.

9    Q.  And, based on your report, did you actually walk through

10   minute by minute the search, the videotape with him as a part

11   of your interview with him?

12   A.  Yes.

13   Q.  Okay.  The other thing I want to address is on page 6.

14   Really, only thing touching on the back and forth about the

15   warden's laptops.  It says in here:  The agent did not find any

16   wrongdoing by Mr. Mendez and Mr. Mendez was critical in his

17   denials, resulting in the agent closing the investigation.

18       Sir, did you make a finding in this case or any other case

19   that a person is credible?

20   A.  No, I do not do credibility assessments.

21   Q.  What -- can you explain as an investigator what you do?

22   A.  When we get evidence, we gather evidence, we deal in

23   preponderance or admissions.  In this particular case, we had

24   more or less a he said/she said.  From the evidence that I had,

25   I did not have enough to sustain or render a sustained finding

1    in that matter.

2    Q.  Okay.  Would you say your job becomes more difficult if the

3    person isn't honest?

4    A.  Oh, definitely.

5    Q.  Why is that?

6    A.  It taints the investigation.  It makes you dig further into

7    things, it leads you in wrong directions.  It can lead to a

8    whole gamut of different issues that can come up.

9    Q.  And, normally, if you're doing an otherwise, other internal

10   affairs investigation, would you coordinate with the SIA

11   sometimes?

12   A.  Yes.

13   Q.  Okay.  And, obviously, if the SIA is not someone you

14   believe is credible or truthful, does that make your job more

15   difficult?

16   A.  Yes.

17   Q.  Okay.

18           MR. DAVENPORT:  Pass the witness.

19           THE COURT:  Mr. Rau, cross-examination?

20           MR. RAU:  Yes.

21                        CROSS-EXAMINATION

22   BY MR. RAU:

23   Q.  You've indicated that the group you were with spoke with

24   Warden Wynn at Starr Pass on January 19th of 2014, correct?

25   A.  Yes.

1   Q.  That was the day before the descent on the SIS office at

2   USP Tucson, correct?

3   A.  Yes.

4   Q.  And this visit wasn't spontaneous, didn't occur at the spur

5   of the moment on January 19th, did it?

6   A.  No, it occurred at midnight on the 20th.

7   Q.  No.  I mean, the planning of your visit to Tucson and the

8   conversation at Starr Pass, that wasn't something that just

9   happened spontaneously on January 19th, was it?

10  A.  Yes.

11  Q.  Where were you before that?

12  A.  Before being at the Starr Pass?

13  Q.  Yes.

14  A.  I was in Butner, North Carolina.

15  Q.  You traveled to Tucson?

16  A.  Yes.

17  Q.  Did you magically appear or did you have to make travel

18  arrangements?

19  A.  I had to make travel arrangements.

20  Q.  And you made travel arrangements for the purpose of what?

21  A.  My supervisor told me I needed to make travel arrangements

22  and meet her in Tucson.

23  Q.  To do what?

24  A.  I was not aware until we got there.

25  Q.  But you knew you were coming to Tucson?

CROSS-EXAMINATION - BRIAN CREGAN

1    A.   Yes.

2    Q.   And it's certainly possible that the warden knew that also

3    before January 19th?

4    A.   I don't know.   I did not communicate with the warden.

5    Q.   You don't know whether someone else did?

6    A.   No.

7    Q.   You are aware that BOP witnesses disclosed to the defense

8    by the government have asserted that Lieutenant Ayers and

9    Lieutenant Hunt were given a key on the orders of the warden,

10   even though they did not possess keys, correct?

11   A.   No.

12   Q.   As part of your investigation, you didn't learn that the

13   warden instructed those people to break the glass of the key

14   safe and provide Lieutenant Ayers and Lieutenant Hunt the keys?

15   A.   No.

16   Q.   As part of your investigation, you never bothered to learn

17   that?

18   A.   No.

19   Q.   As part of your work on this case, you never bothered to

20   review the government's disclosure that contains those reports

21   from BOP employees?

22   A.   No.

23   Q.   So you were not aware that Ayers and Hunt were given access

24   to the SIS office on Saturday the 18th of January?

25   A.   No.

1    Q.  Correct?  You had no idea, right?

2    A.  Correct.

3    Q.  And you're the investigating officer, right?

4    A.  Yes.

5    Q.  You never bothered to talk to anybody who could have told

6    you that?

7    A.  There were no other witnesses presented.

8    Q.  And you never talked to Ayers yourself?

9    A.  No, sir.

10   Q.  And you claim that you interviewed other SIS officers?

11   A.  Yes.

12   Q.  Didn't it seem strange to you the extent of the violations

13   in that office, the amount of complete disarray that you

14   encountered?

15   A.  No.

16   Q.  Interesting.

17        MR. RAU:  I have no further questions.

18        THE COURT:  Mr. Davenport, redirect?

19        MR. DAVENPORT:  Sure.

20                    REDIRECT EXAMINATION

21   BY MR. DAVENPORT:

22   Q.  Item one, do you remember any of the glass around the keys

23   being broken?

24   A.  No, sir.

25   Q.  Okay.  Item two, when you said you didn't think it was

1  strange about the amount of violations, can you explain more

2  further why you didn't feel it was strange?

3  A.   Certainly.  When I was the SIS at USP Lee and took over,

4  they had an interim and some actings and when I had taken over

5  as the full-time position, the office itself was in disarray

6  and we had to go through and straighten up and fix various

7  policy violations.

8  Q.  Do you have any opinion -- when you interviewed, did you

9  have any opinion of Mr. Mendez?

10  A.  No, sir.

11  Q.  Okay.  The -- clarifying a little bit something that I

12  thought was getting a little muddled, I want to just understand

13  the timeline.  You're directed by the internal affairs, your

14  office at internal affairs, to fly from North Carolina to

15  Tucson; is that correct?

16  A.  Yes.

17  Q.  At that point, do you know what you're doing in Tucson?

18  A.  No.

19  Q.  Do you, to your knowledge, communicate with anyone in

20  Tucson and said, "Hey, man, I'm going to be in Tucson"?

21  A.  No.

22  Q.  To your knowledge did anyone else on the internal affairs

23  team communicate and say, "Hey, man, we're going to be in

24  Tucson.  It's good to be here"?

25  A.  Not that I'm aware of.

1  Q.  Okay.  Were you present when Warden Wynn was informed about

2  what was about to happen?

3  A.  Yes.

4  Q.  Based on your observations, did he appear surprised?

5  A.  Yes.

6  Q.  Okay.  Did he show any knowledge or make any statements

7  which would indicate he was aware that you were about -- what

8  you were about to do?

9  A.  No.

10  Q.  Okay.

11         MR. DAVENPORT:  Pass the witness.

12         THE COURT:  Counsel, may this witness be excused?

13         MR. RAU:  Yes, Your Honor.

14         THE COURT:  Agent Cregan, you are excused.  You're

15  free to go about your business.

16         MR. DAVENPORT:  We have no further witnesses for this

17  sentencing hearing, Your Honor.

18         THE COURT:  Mr. Rau, do you have any witnesses you

19  intend to call?

20         MR. RAU:  No, Your Honor.  We will submit on the

21  letters that we've provided on behalf of Mr. Mendez.

22         THE COURT:  All right.  Then why don't you come

23  forward to the podium, have your client come forward with you

24  to the podium.

25     Mr. Rau, did you have an opportunity to go over the

1   presentence report with your client?

2         MR. RAU:  I did, Your Honor.

3         THE COURT:  Do you think he understands the contents

4   of that report?

5         MR. RAU:  Yes, Your Honor.  And he was present with me

6   when I took extensive notes to draft the objections to the

7   presentence report.  I've reviewed my objections to the

8   presentence report with him, as well as the government's

9   response to my objections and probation's final presentence

10  report, which includes its addressing my objections.

11        THE COURT:  And I assume, before your client signed

12  the plea agreement, you went over that entire plea agreement

13  with him?

14        MR. RAU:  Yes, Your Honor, that's correct.

15        THE COURT:  To the extent your client had any

16  questions about the plea agreement, you answered those

17  questions?

18        MR. RAU:  Yes, Your Honor.

19        THE COURT:  So do you think your client understands

20  the contents of the plea agreement and the presentence report?

21        MR. RAU:  Yes, Your Honor.

22        THE COURT:  All right.

23     Mr. Mendez, let me address you.  First I would like you to

24  tell me your full name.

25        THE DEFENDANT:  Jose Alfonso Mendez.

1              THE COURT:  And, sir, you read, speak, and understand

2    English, correct?

3              THE DEFENDANT:  Absolutely.

4              THE COURT:  What is your date of birth?

5              THE DEFENDANT:  3/11/64.

6              THE COURT:  So you are 55 years old?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Are you satisfied with the services of

9    your attorney?

10             THE DEFENDANT:  Absolutely.

11             THE COURT:  Did your attorney review the presentence

12   report that was filed in your case by the probation department

13   with you?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Did he also go over the plea agreement

16   with you before you signed it?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  If you had questions about your case, did

19   your attorney answer those questions?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  And when he was talking to you about your

22   case, were you able to understand everything that he was

23   telling you?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  All right.  Well, let's have the record

1   reflect that on November the 29th of 2018 the defendant entered

2   into a written plea agreement with the government.  He pled

3   guilty to Count 2 of the indictment which charged him with

4   perjury, a violation of Title 18, Section 1621, and which is a

5   felony.  This court by a text order on December the 17th of

6   2018 accepted the defendant's guilty plea.

7       Mr. Mendez, there is a portion of the plea agreement that

8   you signed that is entitled Factual Basis and Relevant Conduct.

9   I assume you read that and went over that with your attorney

10  before you signed the plea agreement?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  All right.  Is everything in there true

13  and accurate to the best of your belief?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  Essentially what you are admitting to, as

16  I understand it, that you gave a false statement during a, I

17  believe it was a video deposition; is that correct?

18              THE DEFENDANT:  It was a telephonic interview with the

19  EEO commission.

20              THE COURT:  A telephonic deposition.  And that was on

21  July the 3rd?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  All right.  And when you acknowledged in

24  the plea agreement that you knew that you were not testifying

25  accurately to that question?

1          THE DEFENDANT:  The question that was presented to me

2     was if I had spoken to the person directly, that's how I

3     interpreted it.  And I said that it was a false statement.  The

4     fact was that I made the statement during a threat assessment

5     meeting in November of 2013.

6          THE COURT:  Well, you've admitted that you knew --

7     that you acted willfully and that you knew and believed that

8     the testimony was false; is that correct?

9          THE DEFENDANT:  It is correct -- if I can explain a

10    little bit, I would like that opportunity.

11         THE COURT:  You'll have an opportunity to address the

12    court in a minute but what you've admitted to in the plea

13    agreement is -- here's what it says:  The defendant acted

14    willfully in that Mendez knew and believed that testimony was

15    false.

16       Is that correct?

17         THE DEFENDANT:  Yes, that is correct.

18         THE COURT:  Okay.  And I'll give you an opportunity in

19    a minute to address the court.  If you want to explain that

20    answer, I'll give you an opportunity in a minute.

21       Mr. Mendez, there's another part of the plea agreement that

22    I want to talk to you about, actually, two parts.  There's --

23    on page 3 it talks about the sentencing guidelines and you went

24    over that with your attorney?

25         THE DEFENDANT:  Yes.

1          THE COURT:  All right.  And page 4 and 5 there's a

2    paragraph entitled Waiver of Defenses and Appeal Rights.  That

3    paragraph essentially provides that, as long as I sentence you

4    in accordance with the terms of the plea agreement, you have

5    agreed to waive your right to appeal my sentencing decisions

6    today.  You are also waiving your right to challenge your

7    conviction in a later proceeding.  The only two exceptions

8    would be ineffective assistance of counsel or prosecutorial

9    misconduct, otherwise, you're waiving your right to challenge

10   your conviction in a later proceeding, and you are also waiving

11   your right to raise any possible defenses that you may have had

12   to the charges in your case.

13      Do you understand that that's -- that waiver is part of the

14   plea agreement?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  And did your attorney go over that with

17   you and explain that to you before you signed the plea

18   agreement?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  I'm going to accept the plea agreement

21   today.  It is the judgment of the court today that the

22   defendant is guilty of perjury, as set out in Count 2 of the

23   indictment.  The offense is a class D felony.  It's a violation

24   of 18 USC 1621 and the offense occurred on or about August the

25   31st of two thousand -- excuse me, July the 3rd of 2014 here in

1    the District of Arizona.

2        Before coming into court this afternoon, I have read the

3    presentence report filed in this case by the probation

4    department, including their recommendations to the court.

5    Mr. Rau, on behalf of his client, filed objections to the

6    presentence report.  Mr. Davenport, on behalf of the

7    government, filed responses to that.  Mr. Rau also filed a

8    sentencing memorandum which I have also read, and Mr. Rau

9    submitted what he refers to as attachment C.  There are letters

10   -- two letters on behalf of the defendant, one from his

11   sister-in-law and one from a coworker.  I've read those letters

12   also.

13       Counsel, is there anything else in written form that I

14   should consider before sentencing this afternoon?

15            MR. RAU:  Your Honor, if I may, did the court also

16   receive letters submitted on May 23rd -- it looks in

17   attachment C and then the letters were also -- I'm

18   double-checking, I guess it's attachment A and B.

19            THE COURT:  I don't see those, you can either let me

20   look at them now if you have them or you can talk about them --

21            MR. RAU:  May I approach?

22            THE COURT:  Sure.

23            MR. DAVENPORT:  Which one is it?  No.

24            MR. RAU:  Your Honor, this was submitted -- it should

25   have been submitted on May 20th of 2019.  Did probation receive

1   it?

2           PROBATION:   (Probation officer shook her head.)

3           MR. RAU:   If I may first present them to the court.

4           THE COURT:   Sure.

5       Mr. Rau -- Mr. Davenport, you've seen them?  Mr. Davenport,

6   you've seen those?

7           MR. DAVENPORT:   I have not.  I'm not disputing that

8   they are what they are.  I'm just saying present them to the

9   court.

10          THE COURT:   Do you want to look at them before I look

11  at them?

12          MR. DAVENPORT:   I'll look at them for a moment, Your

13  Honor.

14          MR. RAU:   Your Honor, I apologize to the court, to the

15  government, and to probation.  Those actually should have been

16  submitted three days before and what I have indicated that they

17  were submitted three days before the one with attachment C on

18  them.

19          THE COURT:   Well, I did notice it was attachment C and

20  it did cause me -- I was kind of curious as to what happened to

21  attachments A and B but I have not seen them so let me look at

22  them before we go any farther.

23          MR. RAU:   And, Your Honor, if I may, before I give

24  them to Ms. Lopez to look at on behalf of probation, I'd just

25  like to read into the record who the letters are from.  The

1    first letter, listed as attachment A, is a letter from

2    Mr. Mendez himself and then attachment B includes a letter from

3    David Clifford, a friend who's retired from the Bureau of

4    Prisons.  A second letter from Becky Smith-Massett, a long time

5    Federal Bureau of Prisons employee.  Third is Linda Frisby,

6    F-r-i-s-b-y, hyphen Thursby, T-h-u-r-s-b-y, also a Bureau of

7    Prisons employee; retired Bureau of Prisons employee Leroy A.

8    Smith, Jr.; Letty Molina, M-o-l-i-n-a hyphen Gutierrez,

9    G-u-t-i-e-r-r-e-z; and John Quan.  And if I may approach

10   probation to give them to Ms. Lopez to take a look at?

11           THE COURT:  Ms. Lopez, did you see them?

12           PROBATION:  No, I have not.

13           THE COURT:  Just give them directly to me.  She's

14   going to end up with them after the hearing so --

15       All right.  For the record, I've also reviewed a memorandum

16   from Mr. Rau.  It's dated -- actually, I don't know if -- dated

17   May the 20th and there are letters, it's attachment A and B.

18   I'm going to be giving it to the probation department after

19   this hearing but I have read the letters that were submitted by

20   Mr. Rau.

21       Okay.  Anything else in written form, counsel?

22           MR. RAU:  No, Your Honor.  I do want to address, I've

23   spoken with the government, they did submit a letter on behalf

24   of Charles Ayers in this case and we do have an objection to

25   that letter.  I don't know if Your Honor wants to hear about my

1    objection now or would prefer to wait.  I don't know even know

2    if Your Honor has received it and has reviewed or considered

3    it.

4            THE COURT:  Are you submitting a letter from

5    Mr. Ayers, Mr. Davenport?

6            MR. DAVENPORT:  We submitted a letter before the last

7    sentencing.  Do you not have a copy, Your Honor?

8            THE COURT:  I do not.  It's not in my packet, so --

9            MR. RAU:  Your Honor, we do object.  I don't know if

10   you want to hear the argument now or prefer to wait.

11           THE COURT:  Go ahead and state your objection.

12           MR. RAU:  Your Honor, our position, first, is that

13   Mr. Ayers has no standing to submit a letter in this case.  He

14   is not actually a victim statutorily and is not entitled to

15   have any input.  This is --

16           THE COURT:  Does he have to be a victim to submit a

17   letter?

18           MR. RAU:  My position is in this particular instance

19   is yes and based on the nature of the letter and its contents,

20   which go far beyond the perjury during an EEOC telephonic

21   deposition, we would urge the court to disregard the letter in

22   its entirety.

23         It appears that Mr. Ayers spends a good amount of time

24   defaming Mr. Mendez on social media.  There are Facebook groups

25   for former and current BOP employees and Mr. Ayers has posted

1    things like:  Staff from Florence, Leavenworth, and Tucson in

2    BOP, former SIA Mendez is now a felon.  And he's posted other

3    things.  It's very clear that he is deeply bitter and resentful

4    and blames Mr. Mendez for things that had absolutely nothing to

5    do with Mr. Mendez or the perjury during the EEOC telephonic

6    deposition.

7        Our position is he's not entitled to submit this letter,

8    he's not entitled to defame Mr. Mendez and try to use that to

9    send Mr. Mendez to prison to assuage his own bitterness.  He's

10   not entitled to try to spread stories about Mr. Mendez and

11   trash him on social media.  And especially since he's not been

12   subject to any sort of cross-examination in a case, none of the

13   things that he puts there, which are defamatory and used really

14   for the purpose of harming Mr. Mendez, are credible and should

15   be considered by this court.

16            THE COURT:  Mr. Davenport?

17            MR. DAVENPORT:  First I have the letter, Your Honor,

18   if you don't have it.

19            THE COURT:  I don't have the letter.  Well, before I

20   look at it, I want to hear your response to Mr. Rau's

21   objection.

22            MR. DAVENPORT:  So the -- first, Your Honor, the

23   context of the perjury in this case is important.  And I expect

24   Mr. Mendez is going to attempt to walk it back but event one is

25   there's a threat assessment related to some complaints that

1   Mr. Ayers makes.  Mr. Mendez, in the closed room of staff with

2   the threat assessment team, says:  He's dishonest and disloyal.

3   Then, when they're evaluating, the EEO counselor puts him under

4   oath and says:  Did you call him dishonest?  Did you call him

5   disloyal?  He said:  That's a false statement.

6       The additional context is I have the civil deposition which

7   was 2015 where he multiple times said:  I don't think he's

8   disloyal, I don't think he's disloyal.  And then it said:

9   Well, I thought he was disloyal to the organization.

10      In my view, that is someone who has been directly impacted

11  by this defendant's crime.  He was someone with responsibility

12  and, drawing on what Mr. Feeney said, this is someone who is

13  supposed to be the white knight in the prison.  And when he

14  lies, that's everything.  He's the guy that's supposed to --

15  his word is supposed to be golden.  And when he lies, the guy

16  he lies against is a liar.  And I think Mr. Ayers makes a very

17  good, and I think clear, articulation of the harm he suffered

18  as a result of this crime.

19      Now --

20          THE COURT:  All right.  I'm going to overrule the

21  objection.  I'm going to read the letter.  If there are

22  portions that I think are relevant, I'll consider them.  If

23  there's portions that I think are irrelevant or inflammatory,

24  then I'm not going to consider them.  We'll note the

25  defendant's objection.  The objection is overruled.

1          All right.  For the record, I've also read a letter

2     addressed to this court from Mr. Ayers.

3          All right.  Anything else in written form, counsel?

4               MR. DAVENPORT:  No, Your Honor.

5               MR. RAU:  No, Your Honor.

6               THE COURT:  All right.  With respect to the guideline

7     calculations, the presentence report proposes a base offense

8     level of 14, a two-level adjustment for acceptance of

9     responsibility, and a total offense level of 12.  The

10    government has objected to the failure to include a two-level

11    enhancement.  I've read your arguments on that.  I'm going to

12    overrule the government's objection; I'm not going to apply

13    that two-level enhancement.  So I find that the total offense

14    level in this case is 12.  The defendant falls into criminal

15    history category I.  The guideline provisions are 10 to 16

16    months.  The plea agreement provides for a range of zero to

17    16 months.

18         And there are a number of objections that have been filed

19    by Mr. Rau.  Do you want to add to what you filed or do you

20    want me to rule on your objections at this point?

21              MR. RAU:  No, Your Honor.  You can go ahead and rule

22    on the objections as they stand.

23              THE COURT:  I'm sorry?

24              MR. RAU:  You can rule on the objections as they

25    stand, Your Honor.

1      THE COURT:  Okay.  I think some of the objections --

2 I'm looking at Ms. Lopez's addendum, which I assume you've all

3 seen.  I think some of the objections are moot because she

4 revised her final PSR.

5      Would you agree?

6      MR. RAU:  Yes, Your Honor.

7      THE COURT:  All right.  With respect to objection one

8 in Ms. Lopez's addendum, I'm going to -- the objection is moot

9 so I don't have to rule on it.  The final presentence report

10 was revised and the government agreed that the revisions were

11 appropriate.

12     With respect to objection two, I'm going to sustain it in

13 part as to paragraph 8.  I think the government agrees with

14 that.  I'm going to overrule it in part as to the issue of

15 Count 1.  The defendant argues or that I should not consider

16 any evidence with respect to Count 1.  That objection is

17 overruled.

18     With respect to objection three, that is also moot; the

19 government agreed with the defendant's objections and the final

20 presentence report has been revised accordingly.

21     The government filed the objection with respect to the

22 two-level enhancement that we've talked about under 3(b)(1.3),

23 that objection is overruled.

24     All right.  Having said all that, Mr. Rau, let me hear from

25 you first and then I'll hear from your client.

1          MR. RAU:  Your Honor, this has been a long and painful

2     process for Mr. Mendez and his family who are here in the

3     courtroom to support him.  As we noted in the sentencing

4     memorandum, he had a longstanding conflict with Warden Lewis

5     Wynn.  He contacted his Congressional representatives regarding

6     the situation of his employment at BOP and had actually sued

7     the Bureau of Prisons.  He is a long-time Bureau of Prisons

8     employee.  He is a military veteran, honorably discharged, and

9     he served the BOP for many years.  He has no criminal history.

10    He is widely beloved, as the letters in his support indicate.

11         THE COURT:  I get the distinct impression from looking

12    at the audience and everything that I've read that he is widely

13    beloved and widely reviled also.

14         MR. RAU:  Yes, Your Honor.  I would say that it's fair

15    to say that there are people who have highly positive

16    impressions of him and those who have highly negative

17    impressions of him.

18       Quite frankly, my position, and in interacting with the

19    government over the many months of this case, was diametrically

20    opposed.  The government's view was everybody who says

21    something good about him is blinded by loyalty, the people who

22    say the negative things are the ones who are telling the truth.

23    Our position is the opposite, that those people who know him,

24    who know his character, who know his integrity support him, and

25    the people who are attacking him, the people who are trying to

1    defame him are people who have, for whatever reason, antagonism

2    or hatred toward him.  I don't know that we can resolve any of

3    that in this particular sentencing but it is fair to say that

4    he is a widely beloved person by a number of people, even if

5    there are those who are very much opposed to him, even though

6    there are those here who are taking pleasure in seeing him

7    standing before the court for sentencing.

8        There was somebody, as we noted for the court earlier, who

9    was taking photographs of Mr. Mendez and his wife to post on

10   social media and taking videos in the hallway.  So there are

11   clearly people here who are taking malicious pleasure in

12   whatever is happening to him.

13       And, despite that, he has tremendous support, not only

14   within his family but also within people of the BOP.  Part of

15   the problem is that current BOP employees don't want to make

16   waves, don't want to endanger their own jobs by supporting him.

17   And so the people who did write letters in his support who are

18   still current BOP employees were quite brave to do so and we

19   thank them and we commend them.

20       I will note that when he was first brought to his initial

21   appearance when I was appointed on the case, I talked to his

22   employment lawyer, Ivelisse Bonilla, who is one of the most

23   respected employment attorneys in Tucson, and she was aghast

24   that he was being charged with perjury because, in her

25   experience, in EEOC depositions people make false statements on

1   both sides and she's never seen anyone charged federally with a

2   felony of perjury.  This was a telephonic deposition.  I would

3   note for clarity that the question specifically was that

4   Mr. Ayers claimed that Mr. Mendez had verbally attacked him and

5   called him disloyal.  The question is quite clearly inelegantly

6   and poorly phrased because it does lead one to assume that the

7   questioner is asking about a specific attack on Mr. Ayers.

8       Mr. Mendez absolutely --

9           THE COURT:  Your client specifically admitted in the

10   plea agreement --

11          MR. RAU:  Correct.

12          THE COURT:  -- that he knowingly gave false testimony.

13          MR. RAU:  Correct.  But I think at the same time, in

14   looking at his conduct, in looking at the ramifications of

15   that, it needs to be factored in what was going on.  He did not

16   have a lawyer present, he was being interviewed telephonically

17   over a situation that had happened some time previously -- I

18   think it was eight months before if I'm -- if I'm not mistaken.

19       This is an instance in which the government took years to

20   investigate this case.  The incidents at issue took place in

21   2014 and 2016, and he was arrested in 2018.  And the government

22   knew where he was, they knew what his residence was, they could

23   have bought him in on a summons.  Instead, they indicted him

24   and issued a warrant.  And they could have had him arrested at

25   home on a warrant, though it wasn't necessary.  Instead, they

1    chose to do so at work in front of his coworkers that he had

2    worked with for years.  That is a tremendous personal

3    humiliation.

4        The suffering that Mr. Mendez has experienced has been

5    extreme.  It is not necessary for him to be imprisoned, despite

6    probation's recommendation, despite the government's request,

7    despite Mr. Ayers' demands in his letter.  A sentence of

8    probation is appropriate in this case.

9        The government asked the court to take judicial notice of

10   the case of Corrections Officer Cody Hunt from the Bureau of

11   Prisons.  And since the court has been asked to take judicial

12   notice, I would point out that Officer Hunt received 60 months

13   of probation for making false statements regarding his

14   involvement with a conspiracy to promote inmate contraband of

15   tobacco for which he expected to be paid $150,000 by an

16   inmate's family.

17       Officer Lopez testified that he made a call, supposedly at

18   Mr. Mendez's behest, to let Officer Hunt know that the inmate

19   that he was working with was an informant.  He didn't report

20   that to anyone, and Officer Lopez admits that he was actually

21   the one who made the call.

22       But, in looking at the subject or the recipient of that

23   supposed call, we have somebody who was far more egregious in

24   anything that he did than anything that's been alleged here

25   under this false statement to Agent Cregan charge or the

1    perjury charge, and that particular individual got 60 months of

2    probation and was allowed to move and have his probation

3    transferred to the District of North Carolina.

4        I think, since the government has asked this court to take

5    judicial notice of that case, it bears on the sentence that

6    Mr. Mendez should receive.

7        Our position is that a sentence of probation is

8    appropriate.  He is now a convicted felon.  He entered into an

9    agreement with the Bureau of Prisons by which he retired.  He

10   is now retired earlier than he had intended to, at a lower

11   retirement rate than he had hoped for, and he is now working.

12       His family is present.  As you can see from the letters

13   submitted on his behalf, he is a mainstay of his family and he

14   often travels out of state to help his family.  His

15   brother-in-law is severely ill and has been going through

16   extensive treatments and his brother-in-law specifically made

17   the effort to come here on behalf of Mr. Mendez, despite his

18   treatments, while he's in an interim period between his

19   infusions, to be able to support the brother-in-law that has

20   been so helpful to him and his family.

21       These people know Mr. Mendez far better than Charles Ayers,

22   than AUSA Davenport, than Agent Cregan, than Officer Lopez.

23   These people love him, they support him, they need him.  And

24   our position is that he is entitled to a term of probation and

25   that's what we ask the court to impose.

1          THE COURT:  All right.  Thank you, Mr. Rau.

2      Mr. Mendez, this is your opportunity to address the court

3  and to tell me anything you think I should know or anything

4  about the offense that you have pled guilty to.

5          THE DEFENDANT:  Okay.  Thank you, Your Honor, for

6  giving me the opportunity to speak to you.  Thank you also for

7  reading those letters that my family, friends, and coworkers

8  wrote to you.  I appreciate that.

9      This has been a long journey for me.  I've been going

10  through this since 2013.  2014, in January 2014, I spent eight

11  months inside of an inmate visiting room that was my, let's

12  say, duty station.  From there I was moved to another location

13  in September of 2014 to a storage room and I stayed there until

14  December 1st of 2015.  Then I was returned back to a visiting

15  room and I sat in this visiting room until the issue came in

16  February where I was arrested.

17      I do want to make this clear that I apologize to you and

18  your staff for this situation that I'm here before you.

19      I was interviewed for -- by a threat assessment committee

20  because it was an allegation that I physically threatened

21  Mr. Ayers.  One of the members in there asked me if I viewed

22  him as being disloyal and dishonest and, at that point, I said:

23  If I'm being accused of physical threats, yes, I do.  Now, in

24  July of 2014, I was interviewed by the EEO commission --

25          THE COURT:  Well, you were placed under oath, weren't

UNITED STATES DISTRICT COURT

1   you?

2          THE DEFENDANT:  Not during the -- not during the

3   threat assessment, sir.

4          THE COURT:  Okay.  I'm talking about, I'm referring to

5   the July 3rd, 2014, telephonic deposition.

6          THE DEFENDANT:  Yes, I was.  It was a telephonic

7   deposition and I was asked multiple questions, questions like:

8   Did you keep -- did you tell Mr. Ayers he couldn't attend

9   meeting?  No.  Did you keep him out of and tell him he couldn't

10  attend intelligence meetings?  And I said:  No.  And then she

11  asked me:  Did you call him disloyal and deceptive?  And I

12  said:  No, that's a false statement.  I interpreted it as if --

13  if I had spoke to him directly.  Nonetheless, I'm still

14  responsible for my actions.

15     As we were going through this situation, I ended up

16  contacting my representatives, specifically John McCain, Martha

17  McSally, and Jeff Flake, and Raul Grijalva.  I received

18  feedback from everybody except Raul Grijalva.  And I spoke

19  multiple times with Jeff Flake and Martha McSally.

20     Shortly thereafter, I was interviewed by the Office of

21  Internal Affairs and that was in September of -- August and

22  September of 2016.  In 2017 I was proposed a letter for

23  reduction in grade and loss of wages, of course.  I responded

24  to that.  Everything that Brian Cregan presented on that report

25  was without merit.  I proved it.  I had all the evidence.

1     In June of 2016 I was demoted.  Cost of -- it was a big

2  chunk of money that I was reduced to so I contacted Ivelisse

3  Bonilla and I presented my case to her.

4          THE COURT:  Now, as I understand it, there was a

5  confidential settlement agreement that was reached; is that

6  correct?

7          THE DEFENDANT:  Absolutely.  I'm not going to --

8          THE COURT:  So I don't want you to get into any of the

9  terms of whatever --

10         MR. RAU:  And, Your Honor, he won't.

11         THE DEFENDANT:  No, I won't.

12    So, basically, we ended up -- they presented an agreement,

13  a settlement agreement, the government.  I agreed to everything

14  except one and then, shortly thereafter, I was arrested and

15  Mr. Rau explained to me the situation and all that.

16    On that day I spent a good chunk of the day, you know, in

17  restraints, leg irons, belly chain, hand restraints.  During my

18  arrest, I was -- I stood in the parking lot during the

19  application of restraints for a long time.  I could only gather

20  that it was for to further my humiliation.

21    Bottom line is this:  As we were going with my attorney in

22  preparation for trial, I presented it to him, I told him, I

23  said:  You know, Eric, the bottom line is, I said that.  I said

24  it.  I made the statement.  I should have known better.  How I

25  interpreted it is irrelevant but I made the statement.  And so

1    for that, yeah, I'm responsible.

2        My family needs me and I need them.  I travel to Salt Lake

3    City practically every other month to assist them -- to assist

4    them in their needs.  They've been very supportive for me and

5    I'm very supportive for them.  I have a full-time job.  I

6    wasn't anticipating doing that but I work construction six days

7    a week from 5:30 to 6:00 or 8:00 p.m. every day except Sundays.

8        Again, I'm sorry for the situation that has been presented

9    to you.  I apologize to your staff, to Mr. Davenport, to all --

10   anybody that is in your group.  So that's all I have to say.

11   Thank you so much.

12        THE COURT:  All right.  Thank you, Mr. Mendez.

13   Mr. Davenport, what is the government's position?

14        MR. DAVENPORT:  Yes, Your Honor.  There may be no

15   better named area of law in crime than corruption.  In the same

16   way that an organization or a person gets sick, the way an

17   organization gets sick is through its people.  Mr. Rau has made

18   the observation, as have you, this was much more extensive than

19   what ultimately got to the needlepoint of a perjury case.

20        And I will say it was one of the more difficult

21   investigations I've gone through because of the practicalities.

22   The defendant is well spoken, he's clean cut, he has military,

23   he has a lot of good people and people who are loyal as can be

24   to him.

25        The people who I was sorting through their complaints were

1   often prisoners, sometimes notorious.  Often, because of the

2   special programming, they were sex offenders.  We were dealing

3   with pornographers, pedophiles, molesters, and those are the

4   people who talked to me and who we were looking at.

5       And I looked through their cases.  I looked through every

6   one.  And, ultimately, I said:  Look, if this guy's dirty, if

7   he's not honest, then there's going to be a case which is just

8   staff, where everyone he talked to is staff.  Guess what?  This

9   is all staff.  The threat assessment was all staff.  The EEO,

10  all staff.  The lawyers, everything's recorded.  This is one

11  where -- and this is the 3553(a) factors -- this is someone

12  who, at least when he stepped in the BOP, I can't speak to

13  whether objectively he is a good man or a bad man, and I look

14  at, is this a man who committed crimes and, in the course of

15  those crimes, caused severe harm.  And he is.

16      He is someone who caused a great deal of damage because he

17  was not someone that was allowed to fall.  The SIA is the

18  internal affairs.  When your internal affairs guy lies, your

19  ability to leverage that and hold other people who are

20  oathbound in that institution, which is everyone else, goes out

21  the window.  When the SIA guy is -- people feel threatened and

22  they feel like they can't report or they feel like they're at

23  risk and they look over and they see that line of everyone who

24  used to be on BOP and isn't, their little knobs lined up, and

25  when that guy goes, I mean, it's -- it's impossible to repair

1    easily.  I know that I -- if I had said what the prisoners, if

2    I had believed them, if I had multiple people prisoners, I

3    would have had some pornographer doing 50 years for creating

4    child porn with Mr. Mendez saying:  No, sir, that's not right.

5    And so I dug in.

6        I think Mr. Rau is incorrect in one thing in that I -- I

7    don't think he's a devil.  I think that there was arrogance and

8    there was selfishness, and I want to draw in back to the

9    perjury because it's important what he lied on.  He said -- he

10   was asked:  Was Mr. Ayers disloyal?  Did you call him disloyal?

11   And part of the reason that I brought in Mr. Lopez and that I

12   brought in, really put on the evidence so you could evaluate

13   the witnesses yourself is to -- so you could get a sense of why

14   that matters, why that loyalty matters.

15       I wish I'd had the letters that kind of got presented to

16   you -- I don't blame Mr. Rau -- because there were little

17   details that when you're going, how can someone be so reviled

18   and so loved, it's little details like, when I interview people

19   I would ask, and with the agents, we would interview people and

20   we'd ask:  What did he tell you about his military service?

21   More than a couple said:  Oh, yeah, he was talking about how he

22   got shot in Afghanistan and how he almost lost his leg and how

23   the insurgent (phonetic) gentlemen took it over.

24       Well, I looked at his reports in his application.  He took

25   no veteran preference, he doesn't have a Purple Heart.  I don't

1    know whether or not he got shot but certainly the indications

2    aren't there.  And so it just is one of those every time you'd

3    look -- and part of the reason that I wanted to let the

4    witnesses speak is, and I went through each thing the defense

5    put in its objections, and, again, Mr. Rau is relying on his

6    client to advance and say this fact exists or not, the sheer

7    gall to assert false statements in sentencing for your perjury

8    case is staggering.  You can evaluate their credibility.  But

9    it looks like he'd legitimately, black and white, told at least

10   four or five asserted false statements in service of before

11   coming to you for a perjury case.

12       I can't fix that.  And if you're evaluating a person, you

13   need to look and go, okay, this is someone who's that far gone.

14   I looked at their witness -- the first waive of letters, and I

15   was concerned when you read the sister-in-law letter you'd go:

16   No acceptance of responsibility.  That would have been a

17   completely inappropriate based on where that story had to come

18   from.

19       Your Honor, there are 30 of this position in

20   100 institutions with -- affecting 200,000 people currently

21   incarcerated, and thousands and hundreds of thousands of family

22   members and formerly incarcerated.  To describe this as a

23   crucial, key, important position in the United States, it's not

24   overblown.  And for that guy to lie throws -- throws

25   corruption, blackens what everyone else is doing, the entire

1    purpose of the institution.

2         I -- I'm sure a lot of people love him.  I'm sure he has a

3    lot of good qualities.  I'm not taking away that he served his

4    country.  But, at the end of the day, the first rule of public

5    service is you serve the public, not your friends, not your

6    family, not yourself.  And that's what he violated.

7         So, Your Honor, I'm asking for at least a year of

8    detention.  I know that that's higher than even Mr. Hunter got

9    but, at the end of the day, we are responsible -- to have the

10   position, that level of position in the United States is a

11   responsibility, it is a weight.  And when you fail and you do

12   so knowingly, and you do so in a way that undermines the

13   credibility of whatever you've done for years, it costs, and he

14   has a price to pay.  And I think that's over a year in prison,

15   Your Honor.

16             THE COURT:  All right.  Counsel, is there any legal

17   cause why I should not proceed with sentencing?

18             MR. RAU:  No, Your Honor.

19             THE COURT:  I've looked at all the factors set out at

20   18 USC 3553(a) in arriving at my sentencing decision today.

21   When I look at the nature and circumstances of the offense, it

22   appears that this defendant, in his plea agreement,

23   acknowledged that he had acted willfully and that he gave false

24   testimony after he'd been placed under oath.  He breached a

25   fiduciary duty he had to his employer and he also committed a

1    crime and he's pled guilty to that crime.  So that is --

2    appears to me as to what happened but it looks to me, in

3    looking at this case, that the story is much, much larger than

4    his -- the false statement that he gave.  As I told counsel at

5    sidebar, I have the distinct impression that I don't have all

6    of the -- there's a lot more going on in this case than I have

7    access to information and that part of this case troubles me.

8        But having said that, Mr. Mendez, nevertheless, you lied

9    under oath.  You tried to walk it back a little bit right now.

10   I'm not going to let you walk it back 'cause you lied under

11   oath.  If you thought that question was confusing, if you

12   thought it was misleading, you're smart enough and experienced

13   enough to say:  I don't understand the question.  Rephrase it.

14   I don't think that's what occurred here.  I think you

15   deliberately lied under oath.

16       Having said that, as I indicated before, it strikes me that

17   there's a lot more going on in this case than I have access to

18   information about.

19       There are mitigators and aggravators in this case.  This

20   defendant had a high ranking position.  He breached a fiduciary

21   duty that he had and there are other people within the

22   organization that, I'm sure, relied upon him and he was -- he

23   was a leader within the organization and he was supposed to be

24   an example setter, and I think you've let yourself down and you

25   let all of those other individuals down by your activity.

1      I also took into consideration that this defendant was --

2  had past military service, he was employed, if I read one of

3  the memorandums or perhaps the presentence report correctly, he

4  was with the Department of Justice for 31 years and he was --

5  spent 14 years as a special investigative agent.  So I'm sure

6  he made a lot of very positive contributions at the same time.

7      He also appears to enjoy strong family support and some

8  level of community support and he has the support of some of

9  his coworkers, as is indicated by the letters that I have

10  received.

11      He is not in a situation anymore where he's going to be

12  able to commit the damage and the harm that he did to the

13  organization because he is no longer -- he's lost his job, he's

14  had to retire early, and he's no longer with the Bureau of

15  Prisons.  I've taken that into account also.

16      In deciding whether to impose a custodial sentence or not,

17  I also considered, frankly, his safety if he were to be

18  incarcerated, although I'm sure arrangements could be made to

19  assure his safety.  But when I look at the overall

20  circumstances in this case, I don't think a custodial sentence

21  is appropriate.  The defendant has no criminal history.  It

22  looks to me like he is suffering a lot of nonincarceration

23  consequences as a result of his actions.  So I am going to be

24  placing him on probation this afternoon.

25      Some people may think that's a very light sentence, other

1    people may think it's a very justified sentence but I think,

2    when you balance all of the factors that I need to consider

3    under 3553(a), I think it's an appropriate disposition.

4        That still does not excuse your behavior, Mr. Mendez.  I

5    don't know, somewhere -- the term I like to use is somewhere

6    you went off the tracks.  I don't know exactly why or when that

7    started but you seem to me to be minimizing some of the things

8    that you've been involved in.  Whether or not there were other

9    circumstances that I'm not aware of that led you to do this,

10   it's not clear to me.  As I indicated earlier, I have the

11   feeling there's a lot more going on in this case than I know

12   about.  But nevertheless, you went off the tracks, to use my

13   term.  I think you know that, I believe that's the case.

14       I am placing you on probation because of your past history.

15   I know that you are -- assist your brother-in-law with his

16   physical condition and I've given that some consideration.

17       I also considered whether or not to impose a term of home

18   detention as a condition of probation to add an additional

19   level of -- to add an additional sanction.  I don't know that

20   it makes much sense in this case.  The defendant -- other than

21   the false statements that he gave and what appears to me to be

22   a pattern of false statements, I don't know that home detention

23   will add anything in this particular case, so I'm not going to

24   be placing him on home detention.

25       For all of those reasons, it will be the judgment of the

1    court today that the defendant be placed on probation for a

2    period of three years.

3        Mr. Mendez, while you're on probation, you're going to be

4    subject to all of the mandatory and standard conditions of

5    probation that this district has adopted in its General

6    Order No. 17-18.  I'm not going to go through all of those

7    conditions with you this afternoon.  This lady over here is

8    from the probation department.  After this hearing, you're

9    going to need to meet with her.  At some point, they're going

10   to schedule an appointment with you with your probation

11   officer.  That officer is going to review all of your

12   conditions with you and you'll be required to sign off for

13   those conditions.

14       I will tell you that one of your conditions of probation is

15   the condition that you are not to violate any laws, whether it

16   be federal, state, or local.

17       I'm also going to order the defendant to cooperate in the

18   collection of a DNA sample.  It's always listed as a special

19   condition; I don't know why.  It's actually, in my judgment, a

20   standard condition.

21       There's a recommendation for the search condition.  I'm not

22   going to be following that recommendation.  I don't see that

23   that is necessary in this case.  If it becomes necessary or

24   appropriate in the future, I'm willing to consider a

25   modification in his conditions of probation to include the

1    search condition.

2        Mr. Mendez, do you have any questions about any of the

3    terms of my sentence?

4            THE DEFENDANT:  No, I don't, Your Honor.

5            THE COURT:  Mr. Davenport, I assume you're moving

6    dismiss Count 1 of indictment?

7            MR. DAVENPORT:  I am, Your Honor.

8            THE COURT:  On motion of the government, I'm going to

9    dismiss Count 1 of the indictment.

10       Based upon the terms of the plea agreement, I find that the

11   defendant has waived his right to appeal this court's

12   sentencing decisions today.  He has also waived his right to

13   collaterally attack his conviction, other than a collateral

14   attack for ineffective assistance of counsel or prosecutorial

15   misconduct.  I'm going to accept the defendant's waiver at this

16   time.

17       Mr. Davenport, anything else from the government?

18           MR. DAVENPORT:  No, Your Honor.

19           THE COURT:  Mr. Rau, anything else?

20           MR. RAU:  No, Your Honor.  Thank you.

21           THE COURT:  All right.

22           CLERK:  I'm sorry, Judge Soto, financial.

23           THE COURT:  Thank you.  Sorry.  I always miss

24   something.

25       I'm not going to assess a fine in this case; I don't think

1    it's necessary.  I am going to order the defendant to pay the

2    special assessment of $100, which is mandatory.  I'm going to

3    order that it be paid at the rate of $10 per month for the

4    first 10 months that the defendant is on probation.  The first

5    payment will be due one month from today's date.

6        Tiffany, did I miss anything else?

7            CLERK:  No, Your Honor.

8            THE COURT:  All right.  After this hearing, right

9    after this hearing, Mr. Mendez, I want you to report to

10   Ms. Lopez, she's a probation officer.  She's going to give you

11   a directive as to when and where to report for a review of your

12   conditions of probation.  We are at recess.  Thank you.

13           MR. RAU:  Thank you, Your Honor.

14       (Whereupon, the matter was concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6     __/s Cindy J. Shearman_____          July 1, 2019
      CINDY J. SHEARMAN, RDR, CRR                DATE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED  STATES  DISTRICT  COURT